

# NUMBER 13-11-00641-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**FRANCOIS VEAZIE CENTERS,**                     **Appellant,**

**v.**

**THE STATE OF TEXAS,**                     **Appellee.**

---

### On appeal from the 9th District Court
### of Montgomery County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Perkes
### Memorandum Opinion by Justice Rodriguez

Appellant Francois Veazie Centers challenges his conviction by a jury for murder. *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2011). By three issues, appellant argues that the trial court abused its discretion in: admitting a recorded interview of him by police; admitting the testimony of his probation officer regarding certain statements made

by appellant; and refusing to allow appellant to question certain State witnesses at trial regarding the alleged sexual assault that precipitated the killing of the decedent. We affirm.[1]

## I. Background

On April 24, 2009, appellant and the decedent, Kevin Marshall, both attended a party at a condo owned by appellant's family at a resort near Lake Conroe. In the early morning hours of the next day, appellant and his girlfriend discovered Marshall and appellant's seventeen-year-old niece in the resort's hot tub. Appellant testified at trial that Marshall appeared to be sexually assaulting his niece. Appellant's niece testified, more specifically, that she was too intoxicated to fight off Marshall's advances and that he was sexually assaulting her. Appellant and Marshall then had a verbal argument, after which appellant retrieved his handgun from the condo, returned to the pool area, and shot Marshall four times. After the shooting, appellant, his girlfriend, and his niece left the resort and went to his parents' home in Humble, Texas. Marshall's dead body was found at approximately 7:00 a.m. that morning.

When it was determined that appellant had left the resort, law enforcement officers went to appellant's parents' home. Appellant's parents gave the officers permission to enter the house and speak with appellant. Appellant agreed to go to the police station to give a statement. Appellant also consented to a search of his room. While his room was being searched, an officer questioned appellant, while they stood beside the patrol

---

[1] This case is before the Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

2

car, about the events of the prior evening. This interview was recorded and lasted approximately one hour.[2] During the interview, the officers conducting the search found the jeans appellant had been wearing at the party. The jeans had a dark stain that tested positive as human blood, and the officer questioning appellant told appellant that jeans with a blood stain were found in his room.[3] Appellant was then transported to the police station, where he was *Mirandized* and eventually admitted to shooting Marshall after he found him in the hot tub with his niece. Appellant was arrested and charged by indictment for murder. *See id.* Appellant was out on bond until his trial, during which time he was required to regularly meet with a probation officer.

Appellant's case was tried to a jury. At trial, the State offered the testimony of several forensic examiners, a crime scene investigator, a DNA analyst, law enforcement officers involved with the investigation and arrest, appellant's probation officer, and several of the other party guests. The defense offered the testimony of appellant's mother and the testimony of his sister, cousin, and niece, all three of whom were at the party at the condo. After the close of evidence and argument by counsel, the jury returned a guilty verdict, and the trial court sentenced appellant to thirty years' confinement in the Institutional Division of the Texas Department of Criminal Justice.

## II. The Recorded Interview

By his first issue, appellant challenges the trial court's denial of his motion to suppress the recorded interview. Appellant argues that he was in custody at the time of

---

[2] The recording continued during the drive to the police station.

[3] It was later determined through DNA testing that the stain on appellant's jeans was not Marshall's blood.

the recorded interview outside his parents' home, and as a result, the failure to *Mirandize* him before the interview rendered the recording inadmissible.

Whether the trial court properly denied a defendant's motion to suppress is reviewed under a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007); *Scardino v. State*, 294 S.W.3d 401, 405 (Tex. App.—Corpus Christi 2009, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). We give almost total deference to a trial court's determination of historical facts and mixed questions of law and fact that rely upon the credibility of a witness, but we apply a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility. *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011). We must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007).

No statement, either oral or written, of an accused made as the result of a custodial interrogation shall be admissible against the accused in a criminal proceeding, unless the accused, prior to making the statement, voluntarily waives his rights pursuant to the following warning that:

> (1)     he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2)     any statement he makes may be used as evidence against him in court;
>
> (3)     he has the right to have a lawyer present to advise him prior to and

4

during any questioning;

(4)     if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5)     he has the right to terminate the interview at any time[.]

*See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2 (West 2005); *see also Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966).   The defendant must prove that the statement he wishes to exclude was the product of a custodial interrogation before the State is required to show compliance with *Miranda* and the article 38.22 warnings.   *See Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (quoting *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005)).   In other words, the State has no burden at all unless the record as a whole clearly establishes that the defendant's statement was the product of custodial interrogation by a law enforcement agent.   *Wilkerson*, 173 S.W.3d at 532. A trial court's "custody" determination presents a mixed question of law and fact. *Herrera*, 241 S.W.3d at 526.

Under *Miranda*, a "custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way."   *Thompson v. Keohane*, 516 U.S. 99, 107 (1995).   "'In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"   *Estrada v. State*, 313 S.W.3d 274, 294 (Tex. Crim. App. 2010) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).   This is an objective inquiry, made from the perspective of an innocent reasonable person.   *Dowthitt*

5

*v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). "[T]he subjective intent of law enforcement officials to arrest is irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect." *Id.* (citations omitted).

A person's decision to accompany police to the station to make a statement does not create a custodial situation absent an express or implied threat to take the person by force. *Dancy v. State*, 728 S.W.2d 772, 778–79 (Tex. Crim. App. 1987). Neither does an interview become a custodial interrogation "simply because . . . the questioning took place in a 'coercive environment.'" *Estrada*, 313 S.W.3d at 294 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). But an otherwise non-custodial interview can become custodial if law enforcement creates a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted or when there is probable cause and law enforcement does not tell the person he is free to leave. *Dowthitt*, 931 S.W.2d at 255. In the latter situation, the existence of probable cause must be communicated to the suspect, and that manifestation, "combined with other circumstances, [must] lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Id.*

After law enforcement officers found appellant at his parents' home the morning after the shooting, they asked appellant to accompany them to the police station to give a statement. Before leaving for the police station, officers asked appellant for consent to search his room, which appellant gave. While some of the officers searched his room, another officer, Detective Michael Landrum of the Montgomery County Sheriff's Department, asked appellant some questions while they waited outside by the patrol car.

6

The conversation between appellant and Detective Landrum was recorded.

In the recording, Detective Landrum asks appellant questions about the occasion for the party, when appellant left the party, when appellant last saw Marshall, the nature of the interaction between appellant's niece and Marshall, and what appellant had been wearing at the party. Detective Landrum informs appellant that Marshall had been found shot to death and asks appellant if he knew anything about that. Appellant responds that he does not.

Approximately forty minutes into the conversation, Detective Landrum receives a call from the officers searching appellant's room; after he ends that call, Detective Landrum tells appellant that the officers found the jeans appellant had been wearing at the party and that the jeans had a large, dark stain on the leg. It was confirmed shortly thereafter by crime scene investigators that the stain was blood, and Detective Landrum communicates this to appellant. When asked why there is blood on his jeans, appellant tells Detective Landrum that the stain could be from a cut on his leg he had several weeks back and that he does not have his jeans cleaned very often so the stain could have been there since then. Before they leave for the station, appellant asks if he can get some shoes from his room. Detective Landrum tells appellant that he will go in and get the shoes. Appellant asks that Detective Landrum choose shoes that match what appellant is wearing.

Several times during their conversation, both before and after they discuss the blood-stained jeans, Detective Landrum tells appellant that he will bring him home after he gives his statement at the station. In the car on the way to the station, appellant and

Detective Landrum chat about the weather, the detective's children, and where appellant went to school. The recording ends when they arrive at the station.

At trial, Detective Landrum testified that when he and the other officers asked appellant to accompany them to the police station to give a statement, he told appellant that he was not in custody and was free to leave at any point. Detective Landrum testified that he also told appellant the interview would be terminated if appellant so requested.

Appellant argues that Detective Landrum's questioning became a custodial interrogation when he informed appellant that a blood stain had been found on his jeans. Appellant argues that this amounted to probable cause and that after communicating it to appellant, Detective Landrum's "demeanor toward [a]ppellant change[d]," he began "communicating with [a]ppellant in an accusatory manner," and appellant was "not told he is free to leave" after that point. Appellant argues that the foregoing transformed the previously informal conversation into a custodial interrogation.

First, based on our review of the recording, we disagree that Detective Landrum's demeanor significantly changed after he informed appellant about the blood stain. Detective Landrum's tone remained largely conversational, and his attitude after communicating the information about the blood stain was not any more accusatory than it had been before the jeans were discovered. And regardless, we must defer to the trial court's resolution of mixed questions of law and fact to the extent it depends on the credibility and demeanor of witnesses, and having denied the motion to suppress the recording, the trial court presumably resolved this matter in favor of the State. *See*

8

*Wiede*, 214 S.W.3d at 24–25; *see also Martinez*, 348 S.W.3d at 922–23. Second, we disagree with appellant's assertion that he was not told he was free to leave after the blood stain was found. Detective Landrum repeatedly told appellant, before and after the blood stain was revealed to appellant, that appellant would be brought home after he gave his statement at the station. *See Estrada*, 313 S.W.3d at 293 n.19 (noting that the record did not support a finding that the defendant was kept from leaving the police station in light of the evidence that "police told appellant several times that he was free to leave and even offered him a ride home"). In short, we cannot conclude that the circumstances surrounding the communication of probable cause to appellant would have led a reasonable person to believe that he was under restraint to the degree associated with an arrest. *See Dowthitt*, 931 S.W.2d at 255.

Appellant also emphasizes the fact that Detective Landrum would not allow appellant to go into the house to get his shoes as evidence that appellant's freedom of movement was significantly restricted and that appellant was therefore in custody at the time. Again, we disagree. Instead, we believe it would have been reasonable for the trial court to conclude that Detective Landrum and the other officers were entitled to keep control of the scene for their own safety and for the preservation of possible evidence, and Detective Landrum's refusal to allow appellant back into the house to retrieve his shoes was consistent with these principles. *See Wiede*, 214 S.W.3d at 24–25; *see also Martinez*, 348 S.W.3d at 922–23. In addition, it is clear from the recording that Detective Landrum's refusal to allow appellant to retrieve his shoes did not alter the nature of the interview. Appellant's concern that the shoes picked by Detective Landrum match what

9

appellant was wearing belies any assertion that the environment had become more coercive as a result of Detective Landrum's refusal to let appellant retrieve the shoes on his own. We are not persuaded by appellant's argument that the foregoing transformed the informal conversation between Detective Landrum and him into a custodial interrogation.

Having reviewed the recording in its entirety and the relevant evidence from trial, we have found nothing supporting a conclusion that appellant was in custody during the time of the recording. Appellant was told he was not in custody, would be free to leave at any time, would be allowed to terminate the interview when he wished, and would be brought home after giving his statement. Appellant then voluntarily agreed to accompany Detective Landrum to the station to give a statement. Other than not being allowed to retrieve shoes from his room, appellant's movements were hindered in no way. Finally, we note that the tone of the interview remained conversational, even chatty, from its inception through the ride to the station. In sum, viewing the circumstances objectively, we cannot conclude that, during the recording, appellant's freedom was restrained to the degree associated with an arrest. *See Estrada*, 313 S.W.3d at 294. The trial court therefore did not err in concluding appellant was not in custody at this time and properly denied his motion to suppress the recording of appellant's conversation with Detective Landrum. *See Herrera*, 241 S.W.3d at 526; *Stevens*, 235 S.W.3d at 740. Appellant's first issue is overruled.

### III. Testimony of Probation Officer

By his second issue, appellant argues that the trial court erred in allowing his

10

probation officer to testify about statements appellant made during the meetings he was compelled to attend as part of his bond conditions. Appellant argues that by requiring him to "generally state the facts of his case" during those meetings, his probation officer essentially forced him to reveal inculpatory facts or else risk the revocation of his bond. Appellant then argues that the trial court's admission of the statements he made at these meetings violated his Fifth Amendment rights because the meetings with the probation officer were custodial in nature, and because appellant was never *Mirandized* during those meetings, any statements he made were inadmissible as a result.[4] *See* U.S. CONST. amend. V; *see also Miranda*, 384 U.S. at 444–45.

Christian Smith, who was employed by Montgomery County as a probation officer during the pendency of appellant's case, testified at trial that his duties as a probation officer included supervising individuals who were out on bond awaiting trial. Smith testified that appellant was one of those individuals who were required to regularly report to him. In the following exchange with the prosecutor, Smith read from the notes he kept from one of his meetings with appellant:

> [Prosecutor]: Did [appellant] give you a version, Mr. Smith, about what happened in this case according to him?
>
> [Smith]: Yes, he did.
>
> [Prosecutor]: Can you, please, read that to the ladies and gentlemen of the jury for me?
>
> [Smith]: "On December 17th of 2009, defendant reported in for

---

[4] In addition, we note that appellant asserts that the meetings with Smith violated his Sixth Amendment rights because he had invoked his right to counsel at this point. *See* U.S. CONST. amend. VI. But aside from generally referencing the Sixth Amendment, appellant makes no substantive argument and cites no legal authority in support of his assertion that his meetings with Smith violated his right to counsel. *See* TEX. R. APP. P. 38.1(i). We therefore do not address this argument.

a scheduled office visit. He came in two hours early. He waited and was seen at his appointment time. Myself, the court liason officer, reviewed all ancillary conditions of bond, and the defendant stated that he understood all those ancillary conditions of bond." Some of this is marked out. "Defendant stated he was at a party in the Piney Shores, and he walked in on his sister's older boyfriend who was raping his drug-induced 17-year-old virgin niece. The defendant stated that the man had a gun laying on the table in the room and picked up the gun and shot him, killing him. The defendant denied any drug and alcohol use. No problems and no charges — no changes were reported to the officer at the time."

[Prosecutor]: Based upon your recollection there, Mr. Smith, did the defendant ever mention anything to you about a hot tub or swimming or anything like that?

[Smith]: I don't recall anything about that[,] no.

Defense counsel then cross-examined Smith about the results of appellant's drug screenings while he was out on bond, and Smith confirmed that appellant's drug screenings were all clean. Smith also confirmed to defense counsel that he did not ask for a "detailed statement" from appellant; he merely asked appellant to "generalize" why he was out on bond.

As discussed above, whether a defendant is in custody for purposes of *Miranda* is a mixed question of law and fact. *See Herrera*, 241 S.W.3d at 526. We defer to the trial court on mixed questions of law and fact that rely upon the credibility of a witness, but we apply a de novo standard of review to mixed questions that do not depend on credibility. *See Martinez*, 348 S.W.3d at 922–23. Although probationers are compelled to meet with officers of the court and provide truthful answers, these meetings do not involve the "coercion inherent in custodial interrogation[s]" and thus do not amount to a "formal arrest

12

or restraint on freedom of movement of the degree associated with a formal arrest."

*Minnesota v. Murphy*, 465 U.S. 420, 430, 433 (1984); *see Cunningham v. State*, 488 S.W.2d 117, 120 (Tex. Crim. App. 1972) (holding that appellant was not in custody for purposes of *Miranda* where the probation officer was conducting his monthly interview with appellant, was not conducting an investigation into a suspected crime, and appellant left following the interview). More specifically, the United States Supreme Court has ruled that a comparison between a custodial interrogation and a probation interview is "inapt[]" for the following reasons:

> Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess. [*Miranda*, 384 U.S., at 456–457]. It is unlikely that a probation interview, arranged by appointment at a mutually convenient time, would give rise to a similar impression. Moreover, custodial arrest thrusts an individual into "an unfamiliar atmosphere" or "an interrogation environment . . . created for no purpose other than to subjugate the individual to the will of his examiner." [*Id.* at 457]. Many of the psychological ploys discussed in *Miranda* capitalize on the suspect's unfamiliarity with the officers and the environment. [A probationer]'s regular meetings with his probation officer should have served to familiarize him with her and her office and to insulate him from psychological intimidation that might overbear his desire to claim the privilege. Finally, the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained. [*Id.* at 468]. Since [a probationer is] not physically restrained and [can leave] the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator.

*Murphy*, 465 U.S. at 433.

Here, the record shows that appellant was required to regularly meet with Smith at appointments that were set up in advance. Appellant was not restrained at the appointments and was free to leave at the end of each appointment—which he did, even

13

after the appointment at which he admitted to shooting Marshall. Moreover, from the record before us, we find no conditions of appellant's bond that required him to reveal the facts of his case to Smith. Indeed, when asked by appellant's counsel whether he required appellant to give a detailed statement at the meeting, Smith confirmed that he asked only for a general description of why appellant was out on bond; unprompted by Smith, appellant chose to detail the events surrounding the shooting. We therefore cannot conclude that appellant's meeting with Smith bore any of the coercive characteristics necessary to transform it into a custodial interrogation that would have triggered appellant's *Miranda* rights. As such, the trial court did not err in concluding that appellant was not in custody at his bond meetings and denying appellant's request to exclude Smith's testimony on this basis. Appellant's second issue is overruled.

## IV. Cross-Examination Regarding Alleged Sexual Assault

By his third issue, appellant argues that the trial court abused its discretion when it refused to allow him to cross-examine certain State witnesses about the alleged sexual assault of appellant's niece by Marshall.

### A. Standard of Review and Applicable Law

"The Sixth Amendment right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-interest, or motives in testifying." *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009) (citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). But this right is not unqualified; trial judges retain wide discretion to limit the scope and extent of cross-examination based on criteria such as "harassment, prejudice, confusion of the

14

issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Hammer*, 296 S.W.3d at 561.

"Generally, the right to present evidence and to cross-examine witnesses under the Sixth

Amendment does not conflict with the corresponding rights under state evidentiary rules."

*Hammer*, 296 S.W.3d at 561 (citations omitted). In those situations where there is a

conflict between the United States Constitution and Texas rules, the Constitution will

control. *Id.* (citing TEX. R. EVID. 101(c)). But in most instances, "compliance with the

reasonable construction and application of a rule of evidence will . . . avoid a

constitutional question." *Id.*

## B. The Testimony

Here, appellant points to testimony by Detective Landrum, Texas Ranger Wende

Wakeman, Montgomery County Sheriff's Department Sergeant Marvin Michael Rogers,

and Collin Barcus (another party guest, then-boyfriend of appellant's sister, and friend of

Marshall's) regarding their knowledge of sexual assaults allegedly committed by

Marshall. Appellant points to the following testimony by Detective Landrum:

| [Prosecutor]: | Did you ever get any calls from this defendant's family about Mr. Marshall sexually assaulting anybody leading up to this? |
|---|---|
| [Landrum]: | No, I did not. |
| [Prosecutor]: | And did you conduct[] what you believe to be based upon your training and experience[] a thorough investigation in this case? |
| [Landrum]: | Yes, I did. |
| [Prosecutor]: | And up to today, have you ever heard of any kind of a complaint prior to the ladies and gentlemen of the jury |

15

being empanelled on this case that Kevin Marshall ever sexually assaulted anybody else?

[Landrum]: No, I have not.

[Prosecutor]: Would that come as a surprise to you?

[Landrum]: It would.

[Prosecutor]: Why?

[Landrum]: The information wasn't — nobody mentioned that information during the investigation.

[Prosecutor]: Okay.

[Landrum]: Never told — that information was never told to me.

After this exchange, the prosecutor questioned Detective Landrum about the statement he took from appellant's sister, who was also at the party. Over appellant's hearsay objection, which the trial court overruled, Detective Landrum testified that in her statement, appellant's sister did not mention that Marshall was "in a gang" or "had sexually assaulted anybody." Detective Landrum then stated that in the "last two and a half years between the time this happened" and the trial, he had not "heard anything about Kevin Marshall sexually assaulting anybody else." Immediately preceding the foregoing exchanges, the prosecution asked Detective Landrum if there had been any calls to law enforcement from the resort reporting violence or any other problems in the days leading up to Marshall's killing. Detective Landrum replied that there had been no calls.

Appellant next points to the following testimony by Ranger Wakeman, in which she described the events leading up to law enforcement going to appellant's parents' home.

16

Ranger Wakeman testified that when they arrived at appellant's parents' home the morning after the shooting, appellant's parents "seemed very surprised that we were there" and seemed to have no "idea at all" as to why law enforcement was there. The following exchange then occurred:

[Prosecutor]: Did they at any time prior to your contact with this defendant and the other folks that we're going to talk about here in a minute, mention anything to you at all about any sexual assault or anything like that?

[Wakeman]: No, sir.

[Prosecutor]: Anything about this defendant, their own son, asleep in their own house? Mention anything to you about acting in self-defense or defending anybody else?

[Wakeman]: No, sir.

Shortly thereafter, the prosecutor asked Ranger Wakeman a series of questions regarding her transport of appellant's girlfriend and niece to the police station to make statements. In response to those questions, Ranger Wakeman testified that the two women did not seem nervous and were being cooperative. Ranger Wakeman further testified:

[Prosecutor]: Did [appellant's girlfriend or niece] mention anything to you in this ride or seem concerned that they had been victimized or anything like that?

[Wakeman]: I remember that there was some sort of an indication or some sort of a hint that there was more to the story than what [appellant's niece] had told us. So I knew whenever I went to talk to [appellant's niece] in Montgomery County that there was something she hadn't told me earlier, I felt like.

Ranger Wakeman then testified that, after appellant's niece gave her statement, she took

17

her to the hospital in the Woodlands. Finally, in response to several questions by the prosecutor about whether appellant had been in contact with his girlfriend and niece after his arrest and during the time they were giving their statements, Ranger Wakeman responded that she had no knowledge.

On cross-examination, defense counsel asked Ranger Wakeman about the investigations at the resort and at appellant's parent's home. Defense counsel then asked Ranger Wakeman about the alleged sexual assault of appellant's niece:

| [Defense counsel]: | Now, obviously at some point there was some concern that [appellant's niece] may have been sexually assaulted because you took [her] to the hospital? |
|---|---|
| [Wakeman]: | Yes, sir. |
| [Defense counsel]: | And the reason for that was for an examination, correct? |
| [Wakeman]: | Yes, sir. |

Defense counsel then asked Ranger Wakeman about her general experience with sexual assault cases, and when counsel asked specifically whether appellant's niece told Ranger Wakeman during her statement that Marshall had raped her, the State objected on hearsay grounds. The trial court excused the jury from the courtroom, and the parties then discussed the admissibility of Ranger Wakeman's recounting of the niece's statement. The trial court ultimately sustained the State's objection, and after the jury was brought back into the courtroom, defense counsel was permitted to ask Ranger Wakeman whether she transported appellant's niece to the hospital after her statement. Ranger Wakeman responded that she did transport the niece to the hospital and that,

18

later, appellant's girlfriend arrived at the hospital to "console" the niece.

Appellant next points to the testimony by Sergeant Rogers. Sergeant Rogers testified that he participated in the investigation at the condo and at appellant's parent's house the morning after the shooting. Sergeant Rogers testified that he spoke with appellant's sister at the condo about the events of the previous day. When asked if appellant's sister told him that "her brother or the defendant in this case ever claimed to have acted in self-defense," Sergeant Rogers responded that "she did not." Sergeant Rogers then testified that he spoke with appellant's girlfriend at appellant's parents' home before she was taken to give her statement at the police station. When asked if appellant's girlfriend provided him "any information about a sexual assault that had taken place," Sergeant Rogers responded that "[s]he did not."

Finally, appellant points to the following testimony by Barcus, who was another party guest, the then-boyfriend of appellant's sister, and a friend of Marshall's:

[Prosecutor]:     Did you end up going back to the condo after [you found Marshall's dead body]?

[Barcus]:     Yes.

[Prosecutor]:     Was [appellant's sister] there?

[Barcus]:     Yes.

[Prosecutor]:     Did she ever indicate to you when you saw her that anything bad had ever happened to [appellant's niece] at all?

[Defense counsel]:     I object to that. It calls for hearsay, Your Honor.

[The Court]:     I'll allow it.

19

| | |
|---|---|
| [Prosecutor]: | Did she? |
| [Barcus]: | She was — as far as the incident, she knew nothing of it because when I went to bed, she went to bed. |
| | . . . . |
| [Prosecutor]: | Did anybody in . . . this defendant's family ever say anything to you after this happened that this defendant did it because he was scared of Kevin? |
| [Barcus]: | No. |
| [Prosecutor]: | Did anybody in his family, including this defendant's own sister, ever say anything to you about this defendant being scared of Kevin hurting somebody else? |
| [Barcus]: | No. |

On cross-examination, defense counsel asked Barcus whether he "recall[ed] an incident in the bathroom during the week [when they had all been staying at the condo] where [Marshall] was having sex with another girl?"  Barcus replied, "Like I said, we was all — it was a party.  Kevin was in a relationship with a young lady."  When defense counsel next asked whether Barcus recalled Marshall "video recording" the sex with the other woman, the State objected, and the trial court then refused to allow counsel to cross-examine Barcus further about the allegation that Marshall had been having sex in the bathroom with another woman at the party and whether appellant's sister had complained to Barcus about that situation.

## C.  Analysis

Appellant argues that by allowing the foregoing testimony and then refusing cross-examination, the trial court left the jury with the impression that the State's

witnesses had never heard of any allegations of sexual assault of appellant's niece by Marshall prior to the trial. Appellant argues that the trial court's refusal to allow him to cross-examine the witnesses regarding statements appellant's niece had made to those witnesses violated the "open door" rule, under which he was entitled to rebut the false impression left by the earlier testimony with the hearsay testimony. *See Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009) ("Evidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence. A party opens the door by leaving a false impression with the jury that invites the other side to respond."); *see also* TEX. R. EVID. 107. Having examined the complained-of testimony in the context of the entire record, we disagree with appellant's characterization of the testimony.

First, Detective Landrum's testimony was clearly referring to alleged assaults by Marshall of other women. In his opening statement, defense counsel suggested to the jury that the evidence would show that Marshall was a gang member and had been causing trouble at the party, including sexually assaulting another woman earlier in the day before his alleged assault of appellant's niece. In context with the preceding questions asking whether there had been any calls from the condo to law enforcement in the days leading up to the shooting, it is obvious that the State's questioning of Detective Landrum was an attempted rebuttal of this theory—that Marshall had assaulted another woman at the party.

It is likewise obvious that the complained-of testimony by Ranger Wakeman—that appellant's family did not mention a sexual assault or that appellant was acting in

21

self-defense of his niece—was referring to Wakeman's initial contact with the family, before transporting appellant's niece and girlfriend to the police station and before the two women gave their statements. Ranger Wakeman's subsequent testimony makes clear that she knew of the alleged assault of appellant's niece on that first day. She testified that, in the car ride, the niece and girlfriend "hint[ed] that there was more to the story." And even though the trial court did not allow Ranger Wakeman to detail appellant's niece's outcry, the trial court did allow Ranger Wakeman to testify that the niece was transported to the hospital for a sexual assault examination.

Next, although Sergeant Rogers testified that neither appellant's sister nor girlfriend told him that appellant was acting in self-defense of someone or that a sexual assault had occurred, he was referring to his investigation of the incident on the morning after the shooting. This testimony does not show that Sergeant Rogers retained that impression throughout the investigation and did not know of the sexual assault allegations until trial.

Finally, Barcus's testimony that appellant's sister did not indicate that "anything bad had ever happened to appellant's niece" was limited to the night of the party. In other words, his testimony was that appellant's sister did not have any knowledge about the alleged assault of appellant's niece because she had already gone to bed with him that night; his testimony was not that appellant's sister concealed the alleged assault of appellant's niece until trial. And the remainder of Barcus's complained-of testimony, like the testimony of Detective Landrum, is clearly related to whether Marshall had assaulted another woman at the party before he allegedly assaulted appellant's niece. Defense

22

counsel's cross-examination, which focused on an alleged sexual incident in the bathroom with another woman, confirms this.

In short, we cannot conclude that the complained-of testimony left the jury with an impression that these witnesses had no knowledge, prior to trial, of the allegation that Marshall had allegedly assaulted appellant's niece—i.e., that door was never opened. *See Hayden*, 296 S.W.3d at 554. As such, the rules did not permit appellant to use hearsay testimony in rebuttal. *See id.* The trial court did not violate appellant's rights in limiting cross-examination of the witnesses on this basis; rather, the court acted within its discretion when it complied with the applicable rules of evidence barring hearsay testimony. *See Hammer*, 296 S.W.3d at 561. We overrule appellant's third issue.

## V. Conclusion

We affirm the judgment of the trial court.


NELDA V. RODRIGUEZ
Justice


Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 10th
day of October, 2013.

23